FILED
2013 Sep-24  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| LINDA J. RODEN, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | ) **CIVIL ACTION NO. CV-11-KOB-3080**-S |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| **Commissioner of the Social**, | ) |
| **Security Administration** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

The claimant, Linda Roden, applied for supplemental security income benefits under Title XVI of the Social Security Act on June 6, 2008 and for disability insurance benefits Title II of the Social Security Act on July 15, 2008. The claimant alleges disability commencing on November 21, 2007 because of wrist drop with a history of fracture of C2 on the right wrist, carpal tunnel syndrome in the right wrist and hand, residuals of staph infections in the left pelvis and thigh, a history of lumbar fractures, headaches, and chronic and severe pain. (R. 158-70). Upon initial review, the Commissioner denied both applications. (R.15). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 3, 2010. (R. 52). In a decision dated July 7, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplemental security income. (R. 9). On June 23, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R.

1

1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ was correct in assigning more weight to Dr. Gill, a consulting examining physician, than to Dr. Walker, a treating physician; (2) whether the ALJ properly applied the Eleventh Circuit's pain standard in assessing the credibility of the claimant's subjective testimony; and (3) whether the ALJ correctly found that the claimant could perform his past relevant work given the ALJ's RFC determination.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986). "[The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to

be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months...."

To make this determination the Commissioner employs a five-step, sequential evaluation

process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

Absent a good showing of cause to the contrary, the ALJ must accord substantial or

considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703

(11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of

consulting physicians unless good cause exists for treating the opinions differently. *Lewis v.*

*Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). The ALJ may discount a treating physician's

report when it is not accompanied by objective medical evidence or is wholly conclusory.

*Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for

3

failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005)

In evaluating pain and other subjective complaints, the ALJ must consider (1) whether the claimant demonstrated an underlying medical condition, and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1225-1226 (11th Cir. 2002); 20 C.F.R. § 404.1529.

If the ALJ discredits the claimant's subjective testimony, he must discredit it explicitly, and articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the court accept the testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

The claimant bears the burden of demonstrating that he cannot return to his past relevant work. *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir. 1990). If the claimant is unable to do past relevant work, the examiner determines whether, in light of the claimants's residual functional capacity, age, education, and work experience, the claimant can perform other work. *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002). The ALJ may determine whether the claimant has the ability to perform other work in the national economy by use of a vocational

4

expert. *Phillips v. Barnhart,* 357 F.3d 1232, 1239 (11th Cir. 2004). The ALJ must articulate

specific jobs that the claimant is able to perform, and substantial evidence must support this

finding. *Id.* For a vocational expert's testimony to constitute substantial evidence, the ALJ must

pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm. of

Social Security,* 265 F.3d 1214, 1220 (11th Cir. 2001).

## V. FACTS

The claimant is a high school graduate and was 60 years old at the time of the

administrative hearing. (R. 57). Her past work experience includes employment as a service entry

clerk and an invoice control clerk. (R. 208). The claimant ceased working full-time in May 2005,

when her employer dismissed her because the company was going bankrupt. At the time of the

hearing, she worked between 17 and 18 hours a week as part of an occupational training program

for senior citizens. At the time of the hearing, her primary responsibilities in the training program

consisted of entering payroll information into a computer. (R.63-69).  The claimant alleged that

she was unable to work because of right wrist drop with a history of fracture of C2 and possible

mild carpal tunnel syndrome; residuals of staph infections in the pelvis and thigh; and a history

of lumbar fractures on x-rays; however, on appeal, the claimant only contested the ALJ's

findings regarding the impact of her wrist drop. (R. 15, Pl.s' Br. 5-9).

*Physical Limitations*

On December 3, 1975, the claimant sought treatment at the emergency room of Parkway

Medical Center Hospital following a serious car accident. She remained in the hospital for the

following month. Dr. J.B. Wiley, the treating physician, observed that the claimant sustained

fractures to ribs 5, 7, and 8 on the left side and a fracture in the left scapula. (R. 514).

5

Nothing exists in the record pertaining to the claimant's medical history between January 1976 and October of 1983.  From October 1983 through November 1983, the record contains medical evidence regarding the claimant's continued back pain and a surgery to treat staph infection in the claimant's left thigh and pelvis.

The record contains no medical information from the period between November of 1983 to March 20, 2000, when the claimant began treatment with Dr. Larry Parker at SportsMed Orthopedic Surgery and Spine Center. The claimant reported that she injured her back lifting a picnic table four weeks prior, causing back pain that was followed by significant pain in her right leg. Dr. Parker stated that the claimant's MRI showed a calcified herniated disc at L5-SI and what appeared to be a significant acute spinal herniation at L4-5. Dr. Parker diagnosed the claimant with lumbar radiculitis in her left lower extremity. The claimant's physical examination revealed "a very positive straight leg raise on the right side," a positive contra lateral straight leg raise, and symmetrical reflexes. Dr. Parker noted that the claimant's back was not tender and that she had a "good range of motion in both hips," but that she walked with an antalgic gait. He also noted that she had a slight weakness in her extensor hallucis longus manual muscle test (EHL). He treated the claimant's symptoms with an epidural steroid injection and prescribed medication for pain. (R. 270).

 On April 13, 2000, the claimant saw Dr. Parker for a follow up visit. Dr. Parker's notes from this visit indicate that the claimant's epidural steroid injections "improved her symptoms quite nicely." He released her from her follow-up appointment and allowed her to return to work the following Monday. He also prescribed Y-Gesic for pain. (R. 269). The record does not contain any information concerning the claimant's medical history for the period of time between

6

April 2000 and April 2005.

On April 7, 2005, the claimant saw Dr. Easton Norwood, a neurologist at Decatur General Hospital, for treatment of a possible epileptic episode. Dr. Norwood conducted an EEG to investigate the source of the claimant's headaches and to determine whether the claimant was epileptic. The EEG was normal with no apparent signs of epilepsy. He referred the claimant to Dr. Philip Neely, a radiologist, who conducted X-rays on the claimant's chest that showed an old rib fracture but no evidence of active disease. Dr. Neely also conducted an MRI of the claimant's brain that showed an old injury with encephalomacia, or cerebral softening, on the right frontal lobe of the brain and a "little bit of increased signal on FLAIR images of the area." Dr. Neely concluded that the image otherwise was normal. (R. 271-273).

On April 11, 2005, the claimant again saw Dr. Easton Norwood, claiming that she began to notice pain or weakness in her right hand several years after a car accident while working in a plant. She stated that she became unable to extend her right wrist completely. The claimant said that after changing jobs, the pain subsided but that the wrist drop had been consistently present ever since. She elaborated that in the past she could not use her hand at all and that her wrist continued to drop, but that all other function had returned to normal. Dr. Norwood's examination revealed that the claimant possessed normal strength in the left arm and that her wrist extensor grading was 4/5, fairly strong. He also concluded that the claimant had a restricted range of motion and was unable to completely extend her right wrist. He noted that a slight weakness possibly existed in the extensor pollicis but that he did not find any other intrinsic hand muscle weakness. Dr. Norwood also stated that the right thenar bulk, the portion of the hand connected to the thumb, was slightly diminished compared to the left but that no fasciculation was present.

7

The claimant had good pinprick association over the hands and had reflexes of 1+ at the biceps and wrists. He also noted that Tinel's sign, a way to detect irritated nerves, was minimally present at the right wrist. When diagnosing the claimant with wrist drop, Dr. Norwood mentioned that the "right wrist drop is old and may not show any active neurologic process." He stated that further plans for treatment would be dependent upon the results of a nerve conduction study. (R. 285-286).

Dr. Norwood ran the nerve conduction study on May 26, 2005. The test detected slow nerve conduction in both the index finger to wrist and the palm to wrist segments of the median nerve of the right hand with normal sensory nerve conduction proximal to the wrist. The other results were normal. Following the test Dr. Norwood diagnosed the claimant with "right wrist drop, pain, possible carpal tunnel syndrome." Dr. Norwood noted that his diagnosis of carpal tunnel syndrome was based solely upon sensory slowing and that no definite evidence of radial neuropathy bilaterally was present. (R. 287-288).

On September 6, 2005, the claimant sought treatment from Dr. Scott Harris, a physician at the Community Free Clinic of Decatur Morgan County, for pain in her right wrist and possible arthritis. Dr. Harris referred the claimant to another treatment center for testing.[1] (R. 408). No record of these tests exist in the record.

On November 5, 2007, Dr. Daniel Andress, an emergency room physician, admitted the claimant, who was complaining of swelling and pain in the left thigh, to the emergency department of Huntsville Hospital. (R.308). Dr. Andress diagnosed the claimant with a staph infection in her leg. Dr. Andress drained the effected area. He also prescribed 20 Septra DS to be

---

[1]The handwriting indicating to where Dr. Harris referred the patient is illegible.

taken once every 12 hours. (R.313-315).

Dr. Suji Mathew treated the claimant, who was complaining of an infection in the left thigh, at Decatur General Hospital later on November 8, 2007. The claimant informed Dr. Mathew that she had a leg infection for the past three weeks. The record mentioned the claimant's extensive history of staph infection, noting that she once developed a staph infection in her pelvis that lasted for several months. Dr. Mathew diagnosed the claimant with severe cellulitis/abscess of the left leg, hypothyroidism, and a month-old staph infection in the pelvis. (R. 563). Dr. Mathew found that the claimant had three abscesses over the posterior aspect of her left thigh. He observed that the area had "begun to drain copious amounts of pus, easily over 2-3 cups full." He sent the fluids collected to the lab for a culture. He also noted the scar on the claimant's lumbosacral area from a previous back surgery. (R. 321-322).

Dr. Robert C. Walker, the surgeon who treated the claimant during her hospital visit, reported that on November 8, 2007, the claimant complained that she experienced difficulty walking over the past month but that the claimant's family stated that she had previously been "very active and functional." Dr. Walker also mentioned in his report that the claimant had been to the emergency department four to five times because she was in pain caused by her leg abscess. On November 9, 2007,  Dr. Walker performed an irrigation and debridement procedure that entailed suctioning the infection from the leg and packing the wounds with Betadine impregnated Kerlix. (R. 434-435).

After receiving the lab results, Dr. Mathew diagnosed the claimant as having severe cellulitis and abscess of the left leg, hypothyrodism, and a history of staphylococcus infections. Dr. Mathew discharged the patient on November 23, 2007. In his discharge report, he stated that

9

one of the wounds began draining spontaneously and noted that Dr. Walker, "did some more incision and irrigation and debridement as she still had significant undrained purulence." Dr. Mathew reported that the claimant had done well post-surgery and the he instructed her to use a wound VAC to keep her wound clean. He also prescribed Bactrim DS for a week. (R. 322-323).

HGA Homecare of Decatur, a program that specializes in post-operative in-home care and family training, admitted the claimant on November 26, 2007. (R.335). Registered nurse Dainell Hicks filled out an assessment of the patient's condition at the beginning of her care. (R. 363). The assessment stated that the claimant was homebound because she had an unsteady gait, had poor balance and needed assistance with her wound VAC. (R.341). The assessment also specified that the claimant was in constant pain that varied in intensity and that this pain prevented her from resting well at times. At the time of her intake into the program, Nurse Hicks noted that the claimant walked only occasionally during the day for only short distances and that she spent the majority of her time in a bed or chair. (R. 347-348). The report noted that the claimant had no major mobility limitations. The report did note, however, that the claimant experienced weakness, stiffness, and unequal grasp and that she was limited functionally by her endurance and ambulation. Nurse Hicks noted at the time of the claimant's admission into the program that the claimant had difficulties balancing while walking, had decreased muscular coordination, and required the use of a cane or walker. (R.356-357).

The intake assessment included a detailed inventory pertaining to the claimant's ability to complete various personal-care tasks. Nurse Hicks reported that the claimant was capable of dressing herself and grooming herself if grooming utensils were within her reach. The claimant was able to take care of basic hygiene needs with minimal assistance and could prepare light

meals. The claimant could not drive but could ride in a car. She was able to do light housekeeping and laundry. The claimant was unable to go shopping but was capable of arranging for a home delivery. (R. 358-360). Nurse Hicks assessed the claimant's overall rehabilitation potential as being "good." (R. 363).

Following the claimant's discharge, Dr. Walker kept track of her post-surgical healing at his practice at Surgical Associates of North Alabama. On November 29, 2007, Dr. Walker removed the patient's wound VAC. He described the wound as healing "very nice" and as "granulating and shrinking and filling in." He commented that he was very pleased with her progress. (R. 433). Also on November 29, 2007, the HGA Homecare Nurse[2] recorded in her nursing progress notes that the claimant experienced limited range of motion, had decreased strength and endurance, and required a walker for ambulation. (R. 367).  She also noted that the claimant described having wound-site pain at a level of 1 on the 0-10 pain severity scale. An HGA Homecare nurse filled out progress notes again on December 2, 2007. On this date, the notes indicate that the claimant continued to require a walker and had decreased strength and endurance, but that the claimant noted that she experienced less pain, ranking her pain as a 0. (R. 367-369).

On December 4, 2007, Nurse Hicks reported that the claimant's ambulation, strength and endurance functions remained the same, but that the claimant described her wound-site pain as increasing to a level of 2. (R. 371). On December 11, 2007, the claimant told Nurse Hicks that neither her strength, endurance and ambulation abilities nor level of pain had changed since

---

[2] Where the court does not indicate the nurse's name, the name does not appear in the record.

December 4, 2007. (R. 374).

On December 14, 2007, Dr. Walker reported that the wound looked "excellent" and that the claimant no longer needed a wound VAC. He stated that the claimant "will return to work whenever she is ready to go." (R. 432).

On December 18, 2007, the claimant saw Nurse Practitioner Charles Misori of Southern Rural Healthcare Consortium in Decatur. Nurse Misori stated that the claimant came in to the office with swelling of the left hip. He stated that the claimant did not have a fever and that the hospital blood count reading showed that the claimant did not have an infection. (R. 552).

On December 19, 2007, the claimant returned to Dr. Walker at Surgical Associates of North Alabama. Because the claimant's greater trochanter, a portion of the femur, was slightly enlarged, Dr. Walker performed an ultrasound and sent 2-3 cc of pus accumulated through aspiration to the lab for culture. On December 21, 2007, the culture came back negative for staph, and Dr. Walker again determined the wound to be healing healthily. (429-430). The HGA Homecare nursing progress notes from December 23, 2007, concluded that the claimant continued to have decreased strength and endurance and continued to require a walker for ambulation. The nurse left the pain scale blank. (R. 377).

On January 2, 2008, HGA Homecare of Decatur discharged the patient. (R. 338). Nurse Hicks completed a discharge report. Nurse Hicks stated that at the time of the discharge, the patient lived alone in an apartment. The patient experienced a tolerable burning pain daily, but not constantly. Nurse Hicks stated that the claimant ranked this pain at a severity of 1 out of 10, claimed the medication decreased the pain, and stated that cleaning the wound increased the pain. The claimant had decreased strength at the time of her release, but her endurance was normal and

she no longer required a walker. (R. 380-382).  Nurse Hicks noted that the claimant was able to dress herself,  take care of her basic hygiene needs, walk, and climb stairs. The claimant could independently prepare her own meals, take care of all housekeeping and cleaning tasks, drive and shop independently. (R. 388-390). The discharge summary concluded that the claimant's recovery goals had been met, that the claimant had improved in functional status, and that the claimant was no longer homebound. (R. 394).  The summary noted that the claimant continued to require some assistance with wound care. (R. 396).

On  January 3, 2008, the claimant saw Dr. Walker for a follow-up. Dr. Walker expressed that the claimant was "very happy with her progress" and that he was also pleased with her healing. He did report, however, that the wound on the back of her thigh was continuing to granulate. He treated this granulation with silver nitrate. He also mentioned that the claimant had already returned to her job at the Morgan County Archives. (R. 428). Dr. Walker filled out a medical source opinion assessing the claimant's abilities on January 3, 2008. In this opinion, he stated that the claimant could only stand for 1-2 hours a day; sit for 1-2 hours a day; and walk for 1-2 hours a day. Dr. Walker cited the claimant's large wound on her left thigh as the clinical basis for his assessment. He communicated that the claimant could only occasionally lift or carry 15 or fewer pounds. He also cited the healing wound on her left thigh as the reason for this restriction. Dr. Walker asserted that the claimant could perform the following functions occasionally: pushing; pulling; using her right or left arm or leg; climbing; balancing; stooping; kneeling; crouching; crawling; reaching overhead; handling; fingering; talking and hearing. Dr. Walker also listed several restrictions on the types of environments in which the claimant could work. He noted that she could never work in extreme cold or heat or in an area exposed to fumes,

13

noxious odor, dusts, mists, gases or poor ventilation. Dr. Walker stated that the claimant could occasionally work in areas with high humidity and vibration. Dr. Walker also stated that the claimant could drive automotive equipment occasionally. (R. 549-550).

On January 16, 2008, the claimant saw Dr. Walker for another follow-up visit. While he described the wound as continuing to heal, he noted that granulation remained a problem. He treated it again with silver nitrate. (R. 427).

On January 30, 2008, the claimant returned for a follow up visit with Dr. Walker, who asserted that the wound was "essentially healed" but continued to treat a small non-epitheliazed area with silver nitrate. During her visit, the claimant complained of pain in her leg that seemed to radiate from her back. Dr. Walker suggested that the pain could be sciatica because it extended beyond the knee. Dr. Walker scheduled a follow-up visit two weeks later.

On February 7, 2008, the claimant saw both Nurse Practitioner Misori and Dr. Matthews at Southern Rural Healthcare Consortium in Decatur. Misori's assessment in his treatment notes stated, in its entirety, "cellulitis." (476-477). Dr. Matthew's noted that the patient reported significant impairment but that the wound was healing well. (R. 551).

On February 14, 2008, Dr. Walker declared the wound to be completely healed and recommended that the claimant use her legs to strengthen the muscles. He did not schedule a return visit for the claimant but stated that she would return only if needed. (R. 424).

On March 11, 2008, the claimant visited the Community Free Clinic of Decatur-Morgan County to have the site of her previous staph surgery checked for infection. The physician on duty[3] noted a scar and a slight pinkness, but pronounced that the claimant was healing well. (R.

---

[3]The name of the physician is illegible.

405).

On May 27, 2008, the claimant again returned to the Community Free Clinic of Decatur-Morgan County for treatment. Nurse Practitioner Casey West diagnosed the claimant with right wrist and knee pain. The claimant noted that Motrin sometimes alleviated her wrist pain. Dr. Wesley observed no obvious visible injuries. (R.403).

On July 8, 2008, the claimant visited Dr. Walker at Surgical Associates of North Alabama complaining of pain in her left leg. The claimant specified that the pain occurred primarily when she bent her leg and flexed it at the hip. Dr. Walker examined the patient and concluded that "she has absolutely no evidence of infection. There is no swelling, no fluctuance, no redness, and no tenderness. Her wound is completely healed and everything looks completely normal. . . ." He reassured the claimant that she did not have an infection. He reasoned that because she had a positive straight leg raising most of the claimant's pain was likely a result of sciatica. He recommended that the claimant do stretching exercises. (R. 423).

The claimant saw Dr. Kenneth Bramlett, an orthopaedic surgeon, at the Orthopaedic Sports Medicine Clinic of Alabama for the first time on July 14, 2008. Her chief complaint was bilateral hands, the inability to use both hands together in an effective way. Dr. Bramlett stated that the claimant reported having ongoing wrist pain that had lasted for several years and was worsening over time. He also noted that the claimant wore a wrist brace and was becoming more left-hand dominant by demand. Upon examination, Dr. Bramlett found that on her right side, the claimant had a good range of motion in her shoulder; good rotator cuff function; good palm up palm down strength; and full extension with hyper extension in her elbow. He noted that her wrist had the ability to "go to 0 and neutrally position the wrist," but that the wrist did have some

weakness and did droop. He also noted that the claimant had the ability to squeeze bilaterally "pretty effectively." He concluded that function of the right wrist was "reasonable" and that dorsal extension of the wrist was the biggest problem. Dr. Bramlett ordered more tests and gave the working diagnosis of radial palsy versus cervical irritation with dorsal extension and wrist weakness of the right side. (R. 444- 445). He recommended a dorsal orthoplast wrist splint. (R. 448).

Chris Smith, an occupational therapist working out of the same practice, saw the claimant on the same day, July 14, 2008. During the appointment, the claimant assessed the pain level in her hands as being a 5 out of 10 and described a tightness in the flexors with extension. She reported noticing the wrist pain in approximately 2003. Upon examination of the right hand's range of motion, Mr. Smith determined that the claimant was capable of full fisting and extending the MP and IP joints fully for a limited time before actively flexing the wrist and fingers. Regarding the right wrist's range of motion, Mr. Smith noted that the claimant's flexion was within functional limitations but that function was limited to neutral activity. In his assessment, Mr. Smith noted back and neck arthritis in addition to wrist pain. Mr. Smith created a treatment plan to increase the claimant's extension each visit and to begin functional wrist extension strengthening. He scheduled a follow-up appointment with the claimant for the following week. (R. 446).

On September 16, 2008, Dr. Marlin F. Gill filled out a consultative disability examination report at the Disability Determination Service's request. Dr. Gill first noted that the claimant's gait was normal and that she walked without assistance. He also reported that her neck appeared to be normal aside from a scar from a previous tracheotomy. He stated that the neck was not

tender but the claimant complained of pain with neck movement. He reported that he claimant could flex to 40 degrees, extend to 10 degrees, and rotate 20 degrees laterally. Dr. Gill also examined the claimant's arms, hands, and wrists. He stated that the claimant's arms appeared normal and that the claimant used both arms with no limitations and had a full range of motion in both shoulders and elbows.  He concluded that her arms were neurovascularly intact and that muscle strength was 5/5 bilaterally. Dr. Gill indicated that the claimant's right wrist and hand showed obvious wrist drop and that she had "no ability to extend her wrist at all." Dr. Gill reported that the claimant retained the ability to close her right hand into a fist with a grip strength of 3-4/5 and that she could oppose her thumb and all fingertips slowly. He found the left wrist and hand were normal.

Dr. Gill observed that the claimant's back looked normal aside from an incision scar in the low left lumbar area just above the SI joint. He did not notice any tenderness but stated that the claimant articulated that she experienced mild discomfort with lumbar movement. The claimant was capable of bending forward to an 80 degree angle from a standing position then moving back into an erect posture. She could also rotate 10 degrees bilaterally.

Dr. Gill found the appearance of the claimant's legs to be normal and symmetrical, but he noted the presence of a large scar on the proximal posterior of the left thigh. He reported that when lying flat on her back, she could lift her legs off the exam table with a strength of 5/5 in the right leg and 4/5 in the left leg. From the standing position, she could squat all the way down then stand back up using the table for balance. She could walk across the room on her tiptoes and heels with no difficulty.

He noted that the claimant was healthy neurologically and that she was alert and oriented.

17

He stated that her speech was clear and understandable and that she engaged in normal conversation. Dr. Gill took note of her right wrist drop but observed no other focal difficulties. (R. 459-460).

On September 19, 2008, Dr. H. Gordon Mitchell completed a consultative physical residual functional capacity assessment at the request of the Disability Determination Services. He found that the claimant had the following physical limitations: could occasionally lift up to 20 pounds and frequently lift 10 pounds; could stand and/or walk for 6 hours in an 8 hour workday with normal breaks; could sit for 6 hours in an 8 hour workday with normal breaks; could  push and pull with her right upper extremities in a limited manner; could frequently balance; could stoop, kneel, and crouch; could only crawl and climb a ramp or stairs occasionally; could never climb a ladder, rope or scaffold; and could handle, finger and feel objects without any limitation but was limited in her ability to reach. (R. 462-464). Dr. Mitchell noted that the claimant had no visual or communicative limitations. In addition to her physical limitations, Dr. Mitchell found that the claimant had several environmental limitations and should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes odors, gases, or poor ventilation. Dr. Mitchell advised the claimant to avoid all exposure to dangerous machinery and unprotected heights. (R.464-465).

The claimant went to the Community Free Clinic of Decatur-Morgan County on February 17, 2009, to seek treatment for left hip and leg pain and "red streaks" on the left hip. Nurse Practitioner Casey West treated the claimant. The claimant reported that the pain was chronic and constant but that taking Motrin before bed seemed to help alleviate the pain. Nurse Practitioner West diagnosed the patient as having chronic hip and leg pain. (R. 482).

18

*The ALJ Hearing*

After the commissioner denied the claimant's request for supplemental security income and disability insurance benefits, the claimant requested and received a hearing before and ALJ on March 3, 2010. (R. 54). At the hearing, the claimant testified that at the time of the hearing she participated in a senior training program. The claimant earned $6,300 a year through the program in 2008. (R. 57-58). She stated that she worked 17 to 18 hours each week, that she received minimum wage as compensation, and that she began the program in October of 2006. (R. 63-64).

The claimant explained that, through the program, she was able to work a flexible schedule and that she did not have set hours when she had to be at work. The claimant testified that the program encouraged her to work Monday, Tuesday and a half day Wednesday each week, but she stated, "working that schedule just absolutely does me in." She stated that she did not think that she would be able to work a 40 hour work week. The claimant noted that she was permitted to work as little as "a couple of hours" or "no hours" each week depending upon her physical capabilities. She testified that as part of the training program, she had been working at the North Central Alabama Regional Council of Government (NARCOG) center since the preceding May. She explained that while she was participating in training, the program was actively searching for full-time employment for her. (R. 63-67).

The claimant admitted letters from two of her supervisors in the program. The letters described the program and the claimant's functional limitations. The claimant presented a letter written by John Allison of the Morgan County Archives on January 30, 2008. The letter stated that Morgan County Archives allowed the claimant to take time off for health reasons and that

she took time off from October 31, 2007 until January 2, 2008. The letter noted that her duties were limited in accordance with her physical abilities and that she was allowed to work at the pace at which she was able. The letter stated, "Due to old injuries, she has limited use of her right hand and occasional bouts with back, hip, and leg pain." Mr. Allison noted in the letter that they allowed the claimant to move from her desk whenever necessary and that she was not required to do moderate or heavy lifting. (R.182).

The claimant also submitted a letter from Lona Johns, a project director at NARCOG, dated February 17, 2008. In her letter, Ms. Johns explains that the program is not a job and that participants are placed in community service assignments at government agencies or at non-profit organizations. The letter noted that the claimant taught herself to print with her left hand because she lost use of her right hand. The letter also noted that the claimant did an excellent job but that she took a longer time to complete reports than other employees. The letter stated that because of her condition, the claimant would not be a candidate for permanent employment. (R. 260).

The claimant testified that she did not think she had missed any work days in the past month. She stated that she never missed entire days because of her condition but that she did sometimes end up going into work later in the day than she intended because of pain. She stated that she had to go to work late three or fewer times each month. She explained that the flexibility of the program's schedule allowed her to wake up, take her pain medicine, and wait for it to become effective before going into work. She testified that the first thing that she did every morning was put her heating pad on her back then take some mild pain medication. (R. 65-66).

She testified that the responsibilities of her current job in the program included entering employee's hours worked into a computer system. (R. 68). She said that she did "some payroll

and computer work with one hand" and that she was able to work in the program despite being "slow" because her supervisors gave her unlimited time to complete assigned tasks. She stated that she could use a computer but that she had to "sort of hunt and peck" using one hand. (R. 58-59).

The claimant testified about her responsibilities at her previous jobs. She stated that at her most recent previous job, she entered payable invoices into the computer from 1999 to 2005. The claimant articulated that she left that job when her employer laid her off while experiencing financial issues that eventually led to the company's bankruptcy. The claimant testified that she did not believe that the lay off was based on the quality of her performance, but she stated that she did not think she was performing as well at the end of her employment as she was when she started. She noted that her employer made adjustments for her by being flexible with her schedule and by giving her more tasks she could perform with her left hand. (R. 68-70).

She testified that from 1987 to 1996 she was an invoice control clerk. She described her responsibilities in that job as primarily consisting of entering information into a computer. (R. 74).

The claimant reported that she experienced lower back pain. She described her back as constantly hurting but stated that the pain was not always severe. She noted that she had to move carefully and avoid lifting things. She testified that she hurt her back a couple of times exiting her truck. The claimant testified that since her staph surgery in 2007, she experienced left hip and leg pain while she was sitting. She noted that her staph infections were reoccurring. She stated that she had six surgeries, two of which she considered to be major. She stated that her last outbreak of staph was in November 2007. She articulated that she did not take recurring

antibiotics for the pain but that she believed the staph infections caused several long-term effects.

The claimant reported "trouble" with the muscle in her left leg and "pain and twinges like you'd stick your finger in a socket." She stated that the pain was distracting at work because it forced her to change positions every 30 minutes. She testified that she could stand in one place for approximately one hour and reported that she had no problems walking or balancing. She stated that her right wrist condition precluded her from lifting objects weighing more than 10 or 15 pounds, but clarified that she generally could not pick up heavy things because she was not strong enough. She said that she did not bend over to avoid injuring her back and that her left leg condition made it impossible for her to squat. (R. 74-77).

The claimant testified that she was able to drive a Ford Ranger truck with an automatic transmission around Decatur. She specified that she had to drive with her left hand and use her right arm to raise the steering wheel when she was on a "straight away."(R. 58). The claimant stated that she was able to take care of all of her personal grooming, bathing, and dressing without assistance, but indicated that she had to button clothing, fix her hair, and apply makeup using her left hand. She stated that her curved right hand was "perfect" for brushing her teeth and that in some situations she found her drop wrist to be helpful. (R.78).

The claimant testified that arthritis pain in her neck and shoulder would hinder her from working a 40 hour work week. She stated that she experienced neck pain and noted that she broke her neck in 1975. She testified that after several surgeries and some recuperation, she was able to go back to work. The claimant said that the pain had grown worse since the surgery and that the pain was worse when she was in one position for a long period of time. She complained that when she was in front of a computer for too long, the arthritis pain in her neck and shoulder

22

caused her head to hurt. She testified that she was able to partake in the senior training program only because they regularly allowed her to take breaks that exceeded 20-30 minutes. She stated that she was able to drive because she could use her neck to turn and look behind her as long as she was sitting still and also because she could use her side mirrors to check behind her. The claimant testified that she used stemic powder and a heating pad to relieve pain, but that she did not take any prescription pain medicine stronger than ibuprofen. (R. 67-72).

The claimant testified that she began having wrist pain in September of 2005 and that it grew worse over time. She said that the condition progressed to a level that rendered her unable to work in 2007, the year she filed her first disability claim. She stated that she only was able to eat with her left hand and that while her left-hand was not her dominant hand, it was becoming "better than it was" with more frequent use. (R. 70-71). She noted that she could not use her right hand because it "turns back in." She showed her wrist to the court and stated that it "droops" and that she found it "hard to control anything." She testified that she wore a brace that held her hand straight. She stated that the brace made her more functional "in a way" but it prevented her from moving any part of her hand except her fingers. She testified that she could not bend her wrist back and forth while wearing the brace. She stated that she was supposed to wear the brace 24 hours a day, 7 days a week. The claimant testified that she was not wearing the brace at the time of the hearing because she wished to show the court her wrist, but mentioned that she had the brace with her and would put it on immediately after the hearing. She testified that she experienced pain in the bone of her wrist that travels down her hand into her thumb and middle finger. She described the pain as stopping half way between her wrist and elbow. (R. 58-61).

The claimant testified that she had a hard time picking up anything and that when she

tried to grip a pencil, she gripped it too tightly. She stated that she could not write with her right hand and that she could not drink from a coffee mug without her hand "turning." She stated that she had no control over the movement. (R.62).

A vocational expert, Patsy Bramlett, testified concerning the type and availability of jobs that the claimant could perform. Ms. Bramlett classified the claimant's previous positions according to the Dictionary of Occupational Titles (DOT). Ms. Bramlett stated that in the past, the claimant had worked as an invoice control clerk and an accounting clerk. She also indicated that the claimant's work through the senior training program was a combination of two positions: data entry clerk and payroll clerk. She testified that invoice control clerk is a sedentary, semiskilled position. She testified that accounting clerk is a sedentary, skilled position. She reported that both data entry clerk and payroll clerk are sedentary, semi-skilled positions. (R. 80).

When asked whether the claimant obtained transferable skills in the course of her employment, Ms. Bramlett responded that the claimant gained the following skills: ability to work in customer service and deal professionally with the general public; ability to keep records and compile data; ability to keep up with sales and hours worked; ability to prepare computer input forms and enter data into computer files; financial detail and invoice payment skills; and ability to deal with wage information. Ms. Bramlett concluded that these skills would transfer to other sedentary or light jobs. (R. 81).

To assess the claimant's capacity, the ALJ asked Ms. Bramlett to assess the abilities of a hypothetical individual. The ALJ described the hypothetical individual as a 60-year-old woman with the claimant's prior work history who could do the following: frequently climb ramps and stairs, balance, stoop kneel and crouch; occasionally lift and carry 20 pounds; occasionally pull

24

10 pounds; stand or walk with no breaks a total of 6 hours a day; sit with normal breaks for a total of 6 hours a day; has use of the right upper extremity to push and pull for no more than one third of the day; cannot work on ladders, ropes or scaffolds; occasionally use the right upper extremity to reach; should avoid concentrated exposure to extreme cold and heat, wetness and humidity, vibrations, fumes, odors, dust, gasses, and  poor ventilation; and cannot work around hazardous machinery or unprotected heights. (R.81-82).

Ms. Bramlett responded that an individual possessing all of the hypothetical characteristics would be able to perform all of the claimant's past work. She also testified that other jobs were available that someone with the hypothetical characteristics would be able to perform. She stated that such an individual could work as a general clerk or administrative clerk, both of which are classified as sedentary and semi-skilled. Ms. Bramlett testified that approximately 800 such jobs exist in the state of Alabama and 47,000 exist in the nation. She stated that the hypothetical individual could also work as a customer service representative, which is a sedentary, skilled position. She stated that 1,200 customer service jobs exist in Alabama and around 65,000 exist in the entire nation. Ms. Bramlett concluded that the claimant could also work in a receptionist-type position, which is classified as sedentary and semi-skilled. She stated that approximately 2,400 jobs exist in the state and 128,000 exist nationally. (R. 82-83).

The claimant's attorney also questioned the vocational expert. The attorney asked Ms. Bramlett if any of the jobs she cited would allow the claimant to work flexible hours "in that you could basically work whatever hours you showed up to work." Ms. Bramlett responded that all of the jobs she cited would typically be jobs that required one to work full time and that the cited

jobs would entail having a set schedule and mandatory attendance. She estimated that for a daytime job, the hours would likely be 8:00 am - 5:00 pm or similar. (R. 83-84).

The claimant's attorney asked Ms. Bramlett for an estimation of an acceptable absentee rate in the jobs she recommended based on the hypothetical. Ms. Bramlett responded that based on studies she read, one day a month would generally be the limit. The claimant's attorney asked Ms. Bramlett if the claimant would be able to perform the suggested jobs if she had no fine manipulation ability in either hand. Ms. Bramlett indicated that having no fine manipulation ability in either hand would eliminate the possibility of performing any of the jobs she previously suggested. The attorney then asked Ms. Bramlett which of the jobs would be eliminated if one could use her dominant hand as primarily just a "help hand." Ms. Bramlett replied that the administrative clerk and general clerk jobs would be eliminated as they require bilateral dexterity.

The ALJ asked  Ms. Bramlett several questions to clarify her responses to the claimant's attorney's questions. In her answers, Ms. Bramlett indicated that the receptionist job would require one to be able to occasionally reach and handle, but would never require one to finger or feel, which is defined as  the use of the fingertips to feel the size shape, temperature, or texture of an object, with either hand. Ms. Bramlett testified that the customer service representative job requires occasional reaching and handling, frequent fingering, and no feeling. She also stated that customer complaint clerk, a sedentary skilled job, requires occasional reaching, handling, and fingering but that no feeling is required for that position. Ms. Bramlett testified that approximately 900 customer complaint clerk jobs exist within the state of Alabama and 47,000 exist within the nation. (R. 84-86).

*The ALJ's Decision*

On July 7, 2010, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 12). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability. Next, the ALJ found that the claimant's right wrist drop with history of fracture of C2 and possible mild right carpal tunnel on the right, residuals of recurrent staph infections in the left pelvis and thigh, history of lumbar fractures, and headaches qualified as severe impairments. The ALJ noted that the record also showed a history of hypertension and hypothyroidism. He concluded, however, that these impairments were not severe. The ALJ noted that despite being unmedicated, the claimant's hypertension was generally controlled and that no evidence existed to indicate that the hypothyroidism resulted in anything beyond mild functional limitations. The ALJ found that the claimant's impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 15).

The ALJ found that the claimant had the residual functional capacity required to perform light work as defined in 20 CFR 404.167 and 416.967(b) subject to the following restrictions: occasionally lift and/or carry, including upward pulling, up to 20 pounds; frequently lift or carry up to 10 pounds; stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday; sit with normal breaks for a total of 6 hours out of an 8-hour workday; occasionally, push or pull with the right arm; occasionally climb ramps and stairs; frequently, balance, stop, kneel, and crouch; cannot work on ladders, ropes or scaffolds; occasionally reach in all directions

27

with the right arm; must avoid concentrated exposure to extreme cold and heat, wetness,

humidity, vibration, fumes, odors, dust, gases, and poor ventilation; cannot work around

hazardous machinery or unprotected heights; frequently perform fine fingering with both

hands.(R. 16).

The ALJ stated that, although the claimant had been "unable to work" since November

2007, she was participating in the Senior Community Service Employment Program's work-

training program at the time of her disability application. The ALJ noted that the claimant was

able to perform a wide range of sedentary to light activities including dusting, laundry, fixing

simple meals, shopping, dressing, bathing, and grooming. He also noted that although the

claimant was right hand dominant, she was able to use her left hand. (R. 16).

The ALJ came to the conclusion that the claimant's neck and back injuries would not

prevent the claimant from doing light work. The ALJ determined that although the claimant was

in a car accident in 1975 and suffered fractures to her scapula, several ribs, and several vertebrae,

her musckoscelatal problems had resolved well. He cited the claimant's mostly consistent

employment from 1985 to 1996 and from 1999 to 2005 as evidence of her recovery. The ALJ

noted that although the claimant sustained lumbar radiculis as a result of lifting a picnic table in

2000, she was able to return to work. He also noted that Dr. Parker reported the claimant to be

quite nicely improved following an orthopedic steroid injection. The ALJ considered an x-ray

from November of 2007 that showed that the claimant had only a mild compression fracture at

L1 and otherwise no fractures and good alignment. He also noted that the claimant did not report

any lower back problems in the course of her home healthcare treatment in 2007. The ALJ also

considered that Dr. Gill found that the claimant had a full range of motion and that her back was

unremarkable in his 2008 examination. (R. 18).

The ALJ considered the claimant's wrist condition. He noted that it began in 2005 and that Dr. Norwood was the first physician to diagnose the issue. The ALJ noted that Dr. Norwood found 4/5 wrist strength and "only possibly slight muscle weakness in the hand and no intrinsic hand muscle weakness." He also noted that the claimant had only a minimally positive Tinel's sign. The ALJ noted Dr. Norwood's findings that the nerve conduction tests were normal except for slow sensory in the index finger to wrist to palm. The ALJ stated that Dr. Norwood interpreted the test results to be indicative of carpal tunnel syndrome based solely on sensory slowing and that Dr. Norwood stated that no definite radial neuropathy existed in either hand. The ALJ took into consideration that although the claimant had been alleging disability from November 2007, no further evidence of a wrist condition exists in the record before July 2008, when a physician noted its existence but offered no medical conclusions. (R.18-19).

The ALJ noted that the claimant made no mention of her hand condition when she was being treated for staph in November 2007 or in any of the numerous home health-care visits made following her surgery. The ALJ took note that the home healthcare nurses reported that the claimant accomplished various activities that would require at least some dexterity including grooming, dressing, bathing, toileting, driving, and shopping. The ALJ concluded that the claimant's reports of her functional limitations were inconsistent with Dr. Norwood's reports that the claimant had a wrist strength of 4/5 and that she only had the inability to fully extend the right wrist in 2005. The ALJ also stated that he found it notable that, although in September of 2008, Dr. Gill stated that during his examination he found that the claimant had "no ability to extend the wrist at all" he also noted that she could close her right hand into a fist with a grip

29

strength of 3-4/5 and that her left hand was normal. The ALJ concluded that her grip strength and ability to form a fist suggested that despite the wrist drop, the claimant had the ability to use the hand for frequent fingering and was capable of manipulation with both hands. (R. 19).

The ALJ noted that Dr. Bramlett reported "that despite 'some weakness' and drooping of the wrist, the claimant had the ability to 'squeeze bilaterally pretty effectively' and that only dorsal extension of the wrist was noted as a problem." The ALJ reasoned that the findings of both Dr. Mathews and Dr. Bramlett supported Dr. Gill's findings. The ALJ also mentioned that the claimant reported daily activities including washing small loads of laundry, shopping, performing basic personal hygiene, and grooming to the extent of wearing earrings. The ALJ also noted the claimant's ability to fill out lengthy, detailed forms neatly and legibly with her non-dominant hand. He concluded that based on the evidence, the claimant's only real disability in her upper extremity is the right wrist drop that should not affect fine manipulation. (R. 19-20).

The ALJ also concluded that although the claimant had a significant history with staph infections, she had recovered. The ALJ referenced notes from home healthcare that indicate that the claimant returned to work with her doctor's permission. The ALJ also referenced Dr. Matthews' February 2008 report that stated that the claimant's wounds from her November 2007 staph surgery were completely healed. The ALJ also pointed out Dr. Walker's July 2008 report regarding the claimant's leg pains, in which Dr. Walker noted no apparent signs of infection. The ALJ stated that visits to Dr. Matthew's office in September 2008 and July 2009 also revealed that the claimant did not have an active infection. (R. 20-21).

The ALJ stated that he gave little weight to Dr. Walker's assessment in January of 2008 that stated that the claimant could only sit, stand, or walk for six hours out of an eight hour

30

business day, could only lift fifteen or fewer pounds, and was subject to other limitations. The ALJ explained his decision to give little weight to the assessment by stating that Dr. Walker's records neither gave a reasonable explanation for these limitations nor offered evidence to support such limitations. The ALJ noted that Dr. Walker's later findings did not support the existence of such limitations. Dr. Walker's records from February 2008 indicated that no evidence of tenderness or infection existed, and his records from July 2008 noted that the claimant's leg was completely normal aside from a leg-raising test. (R.21).

The ALJ noted letters from the claimant's supervisors at the Morgan County Archives in January 2008 and the North-Central Alabama Regional Council of Governments in February 2010 that indicated that the claimant was limited in her functional capacity and would not be a candidate for full-time employment. However, the ALJ stated that he gave theses letters little weight because they were not made by individuals with medical expertise and because he concluded the functional limitations mentioned in the letters were largely self-imposed. (R. 21).

The ALJ stated that he gave great weight to Dr. Gill's September 2008 state agency medical consultant opinion that concluded that the claimant could perform a wide range of light work with the restrictions previously set forth in the ALJ's decision. The ALJ explained that he gave Dr. Gill's opinion great weight because it was consistent with the claimant's  full medical records as well as with the claimant's self-reported activities and abilities. (R.21).

The ALJ concluded that the claimant was capable of performing past relevant work as an invoice control clerk and as a service entry clerk because neither position requires the performance of activities precluded by the claimant's residual functional capacity. The ALJ noted that the vocational expert stated that the claimant could perform her past jobs with a RFC of light

work with restrictions, including the restriction to frequent fine functional fingering. The ALJ

found that Ms. Bramlett's testimony was consistent with the Dictionary of Occupational Titles.

(R 22).

The ALJ also found that the claimant could perform the other jobs the vocational expert

suggested in her testimony. The ALJ concluded that, even if the claimant was limited to

occasional fingering with the right hand, she could still perform the customer service customer

complaint clerk jobs. (R. 23).

## VI. DISCUSSION

**1. The ALJ properly gave the testimony of Dr. Gill, an examining consulting physician, more weight than the testimony of Dr. Walker, a treating physician.**

The claimant alleges that the ALJ improperly gave the testimony of  Dr. Gill, a consulting

examining physician, greater weight than Dr. Walker, a treating physician; therefore, the medical

evidence of record would be contrary to the ALJ's finding that the claimant was able to perform

past relevant work. (Pl.'s Br. 7). The court, however, finds that the ALJ gave adequate reasons

supported by substantial evidence for his decision to give Dr. Gill's testimony more weight; thus,

his decision to give greater weight to Dr. Gill's testimony was proper.

An ALJ must give the opinion of a treating physician considerable weight, unless he has

good reason not to accord the opinion substantial weight. *Lamb v. Bowen*, 847 F.2d 698, 703

(11th Cir. 1998).  Unless a good reason exists for alternative treatment, the ALJ must give more

credit to the opinions of treating physicians than to the opinions of consulting physicians. *Lewis

v. Callahan,* 125 F.3d 1436, 1440-41 (11th Cir. 1997). If a physician's report is entirely

conclusory or is not accompanied by objective medical evidence, the ALJ may discount its

weight. *Crawford v. Commissioner,* 363 F.3d at 1159 (11th Cir. 2004). The ALJ does not commit a reversible error so long as he notes a specific reason supported by substantial evidence for not giving a treating physician's testimony controlling weight. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

This court finds that the ALJ properly assessed the medical testimony provided by Dr. Walker and Dr. Gill. The ALJ stated that he gave greater weight to the examining consulting physician, Dr. Gill's, assessment of the claimant's physical limitations than to the treating physician, Dr. Walker's assessment. Although the ALJ gave a consulting physician's greater weight than a treating physicians, he cited valid reasons for doing so. The ALJ stated that Dr. Walker provided no rationale for the limitations in his assessment, aside from "large healing wound on the left leg." The ALJ articulated that the claimant's wound would not account for many of the restrictions Dr. Walker stated, including the restrictions pertaining to the claimant's arm use and hearing. The ALJ also reviewed the records from the claimant's previous visits with Dr. Walker and noted that no evidence existed in the notes from those visits to support the limitations Dr. Walker gave the claimant.

The contents of Dr. Walker's notes in the record, in fact, support the ALJ's opinion. The ALJ noted that in December of 2007, Dr. Walker reported that the claimant's wound was healing healthily and that the site of the surgery tested negative for infection. (R. 429-430). In January 2008, Dr. Walker noted that he was happy with the progress of the claimant's healing. (R. 380-382). The ALJ also specifically cited a later opinion by Dr. Walker declaring the patient's leg wounds to be completely healed as a reason for devaluing his earlier assessment. (R. 21).

The ALJ noted that Dr. Gill's opinion, in contrast, was supported by "the full

examination and treating record as well as with reported activities and abilities." (R. 21). The ALJ cited the claimant's self-report that stated that she was able to take care of her personal hygiene needs and household chores and her ability to fill out detailed forms as supporting Dr. Gill's findings. The ALJ also noted that Dr. Matthew's September 2008 physical examination showing normal motor function and normal reflexes and Dr. Bramlett's July 2008 finding that the claimant could squeeze bilaterally effectively supported Dr. Gill's opinion. (R. 19-21). The ALJ correctly found Dr. Walker's assessment was conclusory and contradicted by his later reports and that Dr. Gill's was supported by substantial evidence. This court finds that the ALJ applied the proper legal standard in assessing the credibility of Drs. Walker and Gill and substantial evidence supports his decision.

**2. The ALJ properly applied the Eleventh Circuit's pain standard in assessing the credibility of the claimant's subjective testimony**.

The claimant argues that the ALJ improperly found the claimant's subjective testimony regarding her inability to utilize her hand to be unfounded. The court disagrees and finds that the ALJ properly utilized the pain standard to assess the credibility of the claimant's subjective testimony.

The pain standard applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added).  The ALJ

34

must give explicit and valid reasons for discrediting a claimant's subjective testimony to avoid having the testimony accepted as true. *Brown v. Sullivan*, 921 F.2d at 1236. The ALJ may look to the claimant's daily activities as a factor in discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

In this case, the ALJ conceded that the claimant suffers from underlying medical conditions capable of generating pain; however, he found that the entirety of the medical evidence failed to support the claimant's alleged severity of pain. As to her back pain, the ALJ noted that the claimant suffered a back injury in December of 1975, but articulated the following reasons for disregarding the claimant's subjective testimony concerning her limitations: the claimant's ability to work full time from July 1987 to December 1996 and from January 1999 to May 2005; the claimant's ability to return to work after injuring herself lifting a picnic table in 2000; Dr. Parker's report calling the claimant "nicely improved" following an orthopedic steroid injection in 2000; an x-ray from November 2007 that showed that the claimant had only a mild compression fracture and otherwise good alignment; notes from home healthcare in 2007 that did not mention back pain; and Dr. Gill's 2008 finding that the claimant had a full range of motion in her back.

The court finds that the ALJ also properly discredited the claimant's subjective testimony regarding her wrist pain. The ALJ specifically articulated the following reasons for his determination concerning her wrist: Dr. Norwood's 2005 finding that the claimant had 4/5 wrist strength, only slight muscle weakness, a minimally positive Tinel's sign, and close to normal nerve conduction tests; Dr. Norwood's report interpreting the claimant's test results to be indicative of carpal tunnel based solely on sensory slowing and indicated no definite radial

neuropathy in either arm; the fact that although the claimant had been alleging disability since November 2007, no medical evidence of the wrist drop condition exists between Dr. Norwood's initial assessment in 2005 until July 2008 even though the claimant sought medical treatment during that time; the fact that the claimant did not mention her wrist condition to either emergency room staff or the home healthcare nurses when she was treated for staph in 2007; the home healthcare nurses' reports that the claimant could complete tasks requiring dexterity; Dr. Gill's 2008 assessment that the claimant could close her right hand into a fist and had a fairly strong grip; Dr. Bramlett's report that the claimant could squeeze bilaterally effectively and that dorsal extension was her only significant problem; and the claimant's statements that she was able to complete household chores and groom herself to the extent of wearing earrings. (R. 19-20).

The ALJ also concluded that the pain the claimant reported was inconsistent with her history of staph infections. The ALJ noted that the home healthcare nurse's notes from 2007, Dr. Walker's notes from 2008, and Dr. Matthew's notes form September 2008 and July 2009 all indicated that the claimant had recovered from her infections.

Based on the ALJ's explicit findings and articulated reasons for discrediting the claimant's subjective testimony, this court concludes that the ALJ properly applied the Eleventh Circuit's pain standard and that substantial evidence supports his decision.

**3. The ALJ appropriately determined that the claimant could perform past relevant work given his RFC determination.**

The claimant argues that the ALJ erred in finding that the claimant's past relevant work was available to an individual with the claimant's residual capacity. This court disagrees and

finds that the ALJ was correct in finding that given the claimant's RFC, the claimant could perform both her past relevant work and the other available work cited by the vocational expert.

To receive a disability determination the claimant must prove that she cannot return to his past relevant work. *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir. 1990). If the claimant proves that she cannot return to her past relevant work, the ALJ must determine whether the claimant can perform other work based on her functional capacity, age, education, and work experience. *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002). The ALJ may utilize a vocational expert to determine whether the claimant can perform other work. *Phillips v. Barnhart,* 357 F.3d 1232, 1239 (11th Cir. 2004). The ALJ must list specific jobs that he finds the claimant is able to perform and his findings must be supported by substantial evidence. For the ALJ's testimony to constitute substantial evidence, the ALJ must present the vocational expert with a hypothetical question that lists all of the claimant's impairments. *Vega v. Comm. of Social Security,* 265 F.3d 1214, 1220 (11th Cir. 2001).

This court finds that the ALJ abided by the proper procedures for determining what work the claimant could perform. First, the claimant did not meet her burden of producing substantial evidence to show that she could not perform her past relevant work. As stated in the preceding issue, the ALJ correctly gave substantial weight to medical testimony stating the claimant's functional restrictions and properly discredited the claimant's subjective testimony regarding her wrist condition. Thus, the ALJ correctly assigned the claimant a RFC of light work with special limitations.

Also, the vocational expert testified that, with the claimant's residual functional capacity of light work with limitations, the claimant could perform all of her past relevant employment.

Based on the vocational expert's testimony, the ALJ found the claimant to be capable of performing her past work. (R. 34).

Despite the fact that the ALJ was not required to go any further in his analysis after determining that the claimant was capable of performing her past work, he asked the vocational expert, in the correct hypothetical format, what other jobs someone with the residual functional capacity of the claimant could perform. The vocational expert replied that the claimant could work as a general clerk or as a customer service clerk, jobs that exist in substantial number both in the state and the nation. (R. 34-35).

The claimant also argues that all of the jobs the vocational expert recommended involve frequent fine manipulation and fingering; therefore, the claimant would not be capable of performing such work. (Pl. Br. 6). This court finds this argument to be without merit for two reasons. First, the ALJ properly found that frequent fine manipulation and fingering was within the claimant's residual functional capacity. Second, the claimant's arguments have no factual basis. Not every job that the vocational expert listed as available to the claimant required frequent fingering and manipulation. Ms. Bramlett testified that the receptionist job did not require any fine fingering and that the customer complaint job required only occasional fine manipulation. (R.85-86). This court finds that substantial evidence supports the ALJ's findings on this matter.

The claimant also argues that the ALJ ignored Ms. Bramlett's testimony that concluded that if the claimant could only use the right hand as a helper hand, she would be incapable of performing both past relevant work and the other work Ms. Bramlett cited. (Pl. Br. 6). The court finds this argument unpersuasive. The vocational expert did not testify that limited use of the

right hand would preclude the claimant from any relevant work. While Ms. Bramlett stated that

the inability to use any hand for fine manipulation would eliminate all of the jobs she

recommended, she stated that the limitation of using the right hand as a helper hand would

exclude the claimant only from performing the administrative clerk and general clerk jobs. The

claimant could still perform the receptionist job and customer complaint clerk job that the

vocational expert listed if she were limited to using her right hand as a helper hand. (R. 84-86).

In conclusion, this court finds that the ALJ properly determined that significant jobs were

available for an individual with the claimant's residual functional capacity.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is

supported by substantial evidence and is to be AFFIRMED.

DONE and ORDERED this 24th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

39